IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF AALIYAH R. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF AALIYAH R. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
SHEILA B., APPELLANT.

Filed February 20, 2024.    Nos. A-23-534 through A-23-537.

Appeals from the County Court for Scotts Bluff County: JAMES M. WORDEN, Judge. Affirmed.

Leonard G. Tabor for appellant.

No appearance for appellee.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

INTRODUCTION

Sheila B. appeals from the decision of the county court for Scotts Bluff County, sitting as a juvenile court, terminating her parental rights to her four children, Aaliyah R., Juliana R., Noah R., and Stephanie R. We affirm.

BACKGROUND

PROCEDURAL BACKGROUND

Sheila is the biological mother of Aaliyah, born in 2008, Juliana, born in 2014, Noah, born in 2015, and Stephanie, born in 2020. Sheila's husband, Cipriano R., is the children's father. Cipriano's parental rights to the four children were terminated during these same juvenile

- 1 -

proceedings below. Because Cipriano is not part of this appeal, he will only be discussed as necessary.

On June 25, 2021, the State filed separately docketed juvenile petitions alleging that Aaliyah, Juliana, Noah, and Stephanie were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because they lacked proper parental care by reason of the fault or habits of their parents in that:

> a) Juvenile's parents fail to meet the juvenile's educational needs, or a sibling of the juvenile's educational needs
>
> b) [Sheila] has a lengthy history of substance use, which has not been addressed
>
> c) Juvenile was the subject of a prior 3a case that closed January 2021 involving the same issues and the family has not demonstrated any change in the circumstances that led to the original adjudication.

Following a hearing on July 7, 2021, during which the parents denied the allegations in the petition, the juvenile court entered a journal entry and order that stated, "The children are not removed from the home at this time."

Following a September 22, 2021, hearing on a motion for custody and placement, the juvenile court ordered that "the juvenile[s] be taken into temporary custody of the Nebraska Department of Health and Human Services [(DHHS)]" and that "[p]lacement is to stay with the parents."

On September 30, 2021, the juvenile court ordered the children to undergo hair follicle testing. Then, following a hearing on October 12, the juvenile court granted a motion for emergency placement of the children after finding that the children had been removed from an unsafe environment and placed in foster care; hair follicle test results had been received. The children have remained in out-of-home placements ever since.

On November 18, 2021, Aaliyah, Juliana, Noah, and Stephanie were adjudicated to be children within the meaning of § 43-247(3)(a) based on Cipriano's admissions to an "amended" petition; he admitted to "education" regarding Aaliyah, and "not having safe and stable housing" regarding all of the children.

On March 7, 2022, Aaliyah, Juliana, Noah, and Stephanie were again adjudicated to be children within the meaning of § 43-247(3)(a), this time after a contested adjudication hearing involving Sheila.

A disposition hearing and several review hearings were held throughout this case. Following each hearing, the juvenile court adopted "the provisions" of various DHHS case plans and directed all parties to comply with the same. The various case plans, save one, do not appear in our record. The provisions of the one case plan for Sheila that does appear in our record will be set forth later in this opinion.

On March 20, 2023, the State filed motions to terminate Sheila's parental rights to Aaliyah, Juliana, Noah, and Stephanie pursuant to Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016). The State alleged that: Sheila had substantially and continuously or repeatedly neglected and refused to give the children, or a sibling of the children, necessary parental care and protection; Sheila was unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which conduct was seriously detrimental to the health,

morals, or well-being of the children; reasonable efforts to preserve and reunify the family failed to correct the conditions leading to the adjudication of the children under § 43-247(3)(a); the children had been in an out-of-home placement for 15 or more months of the most recent 22 months; and termination of Sheila's parental rights was in the children's best interests.

TERMINATION HEARING

The parental rights termination hearing was held on May 22, 2023. The State called several witnesses to testify, and numerous exhibits were received into evidence. Sheila testified in her own behalf and called a witness to testify on her behalf.

Patricia Erny, a children and family services specialist with DHHS, testified that she was the children's caseworker in a previous juvenile case that began in October 2020. In that case, Stephanie tested positive for methamphetamine and amphetamines at birth, and all four children were subsequently adjudicated to be within the meaning of § 43-247(3)(a). The children remained with Cipriano, who was separated from Sheila at the time. DHHS provided services to the family including case management, family team meetings, supervised parenting time, and family support services. Erny never met Sheila during that case. According to Erny, Sheila was provided with up to 35 hours per week of supervised parenting time, but she only had two visits from November 23, 2020, until January 20, 2021; she "didn't show up or respond to any other requests to set up a visit." Erny stated that the case was closed on January 20, 2021, "[a]t the disposition hearing." At that time, the children were with Cipriano, who was still separated from Sheila.

Courtney Armstrong, a child and family services specialist supervisor with DHHS, testified that she has been the supervisor for the children's case(s) since 2020. During the previous case, Stephanie tested positive at birth for methamphetamine and amphetamine. Armstrong said she later learned that the hospital did not test for fentanyl, but Sheila said she was using opioids "[a]nd she had the symptoms of opioid withdrawal." Armstrong was also aware from her review of records from California that Noah, born in 2015, also tested positive at birth for amphetamines. After the previous 2020 case was closed, Armstrong oversaw an "alternative response" case in May 2021 after Juliana and Noah missed 28 days of school; Aaliyah also missed a "substantial amount of time." Armstrong explained that alternative response is a "preventative service." She said, "we're calling the parents to let them know we have got an investigation" and "[w]e're getting the parents' permission to see the kids, meeting in the family home, kind of working through a less intrusive service for families." Cipriano participated in the first two visits but denied wanting ongoing services.

Armstrong testified that in the current case, the children came into DHHS custody on September 22, 2021, but were not removed from the home until October 8, after the results of the children's hair follicle tests were received; all four children tested positive for methamphetamine. Aaliyah also tested positive for cannabis, but she admitted to using it once prior. Armstrong stated that right before then another intake was received on October 6 wherein the reporter "alleged that 13-year-old Aaliyah . . . had reported that her parents were using meth again in the home and possibly using blue pills," that "[t]hey were isolating themselves in the bathroom -- or in the bedroom and having friends overusing [sic] meth and the little kids were in the house." Armstrong also stated that "Aaliyah reported to this reporter that her mom never stopped using and her dad

had just relapsed in August, as he is picking his face a lot." On October 8, Armstrong contacted Officer William Howton to assist her in removing the children, who were residing with Cipriano.

Officer Howton with the Scottsbluff Police Department testified that he was currently assigned to the WING Drug Task Force, a group that investigates narcotics and violent crimes. On October 8, 2021, he assisted Armstrong in removing the four children. Upon entering the apartment, Officer Howton smelled marijuana. Cipriano was informed that his children were going to be placed in the care of DHHS; Aaliyah and Stephanie were present in the home at that time. A search warrant for the apartment was then obtained and executed that same day. Located inside the residence were numerous items of drug paraphernalia with residue, a glass pipe with a crystal-like substance appearing to be methamphetamine, and a green leafy substance that appeared to be marijuana. Some items tested positive for methamphetamine, and others tested positive for marijuana. Cipriano later advised Officer Howton that he lived at the residence with the four children, and that he and Sheila were not currently together, but she did come over to visit the children.

A few days later, Officer Howton spoke with Sheila on the phone about the search of the residence. During the conversation, Sheila admitted that she used fentanyl and methamphetamine, and that she last used a few days prior. She informed Officer Howton that she was an addict and needed treatment. When asked what Sheila reported about her use of drugs around the children, Officer Howton replied, "She did advise that she does use drugs in the same house; however, not in the same room [as them]." On cross-examination, Officer Howton was asked if he was able to determine if Sheila was living at the residence at the time the children were removed. He responded, "Cipriano . . . advised that she was not," but "[Sheila] did inform [sic] that she was staying there, that she was not living there, but she sometimes stayed there."

According to Supervisor Armstrong's testimony, the children remained in out-of-home placements after their removal on October 8, 2021.

Armstrong stated that the children were adjudicated to be within the meaning of § 43-247(3)(a) in November 2021 after "Cipriano entered an admission to the allegations of lacking safe and stable housing," and "there was . . . a contested adjudication for [Sheila] which occurred on March 7th of 2022." A disposition was held on March 9, with a permanency goal of guardianship and a secondary goal of adoption. DHHS developed a case plan for Sheila.

Exhibit 46, the case plan for Sheila in effect from August 10, 2022, to January 31, 2023, was received into evidence. According to the case plan, the "[g]oal" was for Sheila to "provide a safe and appropriate home for her children as evidenced by addressing and managing substance use, keeping the home free from domestic violence, having healthy coping skills and addressing mental health, meeting all of their daily basic needs, having a healthy support system, and demonstrat[ing] appropriate parenting skills." The "[s]trategies" listed to achieve that goal were for Sheila to (1) maintain regular communication with her caseworker, (2) attend monthly family team meetings and have monthly visits with her caseworker, (3) attend Circle of Security and implement the skills learned at her supervised visitation, (4) build a positive network of support and identify how often and when those supports could provide assistance to the family, (5) complete a mental health and substance use evaluation and follow the recommendations, (6) attend visitation, (7) work with Education Development Network to assist her in learning about a child's developmental, emotional, and behavioral needs, and (8) work with Healthy Families. When asked

if any of the strategies or goals for Sheila changed during the course of this case, Armstrong replied, "No, it did not." The case plan included progress notes dating back to November 9, 2021.

Armstrong testified about Sheila's progress in this case. She said Sheila's communication "was extremely sporadic during this entire case." Armstrong was able to see Sheila on October 8, 2021, the date of the children's removal. The next contact with Sheila was on December 1. After that it was 8 months before Armstrong was able to see Sheila again, when she was incarcerated in August 2022. There was no contact in September as Sheila "was unable to be located as she was bailed out of jail." On October 27, Armstrong was able to make contact because Sheila "was back in incarceration."

Armstrong stated that in November 2022, she was able to make contact with Sheila, who came into the office; Armstrong arranged for Sheila to complete a substance abuse evaluation the next day, but Sheila did not show up for her appointment. However, in December, Sheila brought Armstrong a substance abuse evaluation dated October 28, 2022 (Sheila had not previously told Armstrong that she had already done the evaluation). Armstrong said she reviewed the evaluation, and that the recommendation was for Sheila to do inpatient treatment. Sheila told Armstrong that she would be going to a specific inpatient residential treatment facility; Armstrong was not sure whether the facility was "dual diagnosis," but did note "that it is at least substance use." Sheila did not go to inpatient treatment during Armstrong's supervision of the case. Armstrong was asked about drug testing in this case. She replied, "Due to the parents not being actively involved in this case, there was never a court order for drug testing," and "[t]here was enough evidence to support that the parents were probably actively using anyways."

Armstrong testified that family team meetings were "incredibly difficult to schedule." Whenever DHHS workers saw Sheila, they asked her to please keep in communication and let them know when she was available so that a team meeting could be scheduled. But Armstrong said, "[W]e were never able to," and "[i]t was just only when we could catch her that we would make the face-to-face contacts." To Armstrong's knowledge, Sheila never completed Circle of Security. As for building a positive support network, Sheila identified Cipriano (her husband) and Victoria R. (her mother). Although Stephanie qualified for Early Development Network services, Armstrong did not believe the family ever worked with them. And to Armstrong's knowledge, Sheila never worked with Healthy Families.

Armstrong testified that during this case there were 15 hours of supervised parenting time offered each week. Sheila attended 67 percent of her visits in October 2021, zero percent from November 2021 to September 2022, 25 percent in October 2022 (3 out of 12 visits), 90 percent in November (10 out of 11 visits), and 83 percent in December (5 out of 6 visits). From November 2021 to September 2022, DHHS had "[b]arely any contact" with Sheila. When asked what efforts DHHS made to try to have contact with Sheila, Armstrong replied, "We sent Facebook messages," "gave letters to Victoria . . . in case [Sheila] were to show up," "called [utility companies] trying to see if services were ever hooked up in [her] name," "called the numbers for the phones that we had been given," and "constant trying to show up when we received the Scotts Bluff County Court docket" to see if we could catch her at a hearing. (According to Armstrong, Sheila was in and out of jail between the fall of 2021 and the fall of 2022). On cross-examination, Armstrong was asked if Sheila appeared to love the children and be bonded with them when she was with them;

Armstrong replied, "Yes." At the time of trial, Armstrong did not know where Sheila was living and did not believe she was ever employed.

Armstrong was "extremely concerned" about the family's lack of participation. To Armstrong's knowledge, Sheila was currently in treatment which was "a huge positive step in the right direction." However, the current case had been open for 19 months, and "[i]f you tack on the efforts . . . [DHHS] tried through the alternative response, the case in 2020, Stephanie's tested positive three times in her young life of being only two years old, . . . [and] the kids all being substance exposed," Armstrong was "extremely worried that the parents just haven't made the efforts to rectify their situation with getting the help and continued behavioral changes of being clean and sober for their children." Armstrong described the case plan progress for an entire year as "nonexistent," and "would say now we're looking at still a very poor rating."

Breanna Bird, a child and family services specialist with DHHS, testified that she has been the children's caseworker since January 2023. According to Bird, Sheila's case plan goals and strategies have not changed during Bird's time on the case. Bird testified about Sheila's progress on the case plan. As for communication, Bird had difficulty getting ahold of Sheila in February but was able to get ahold of her in March because Bird attended a court hearing in district court; Sheila had a first appearance on a possession of a controlled substance case. Bird saw Sheila in April (utilized as a team meeting) and May, and there had been "sporadic text message communication." Sheila did not participate in Circle of Security. Her primary support was her mother, "but beyond that there is not much of a support network"; "Sheila . . . recognized that she has been using and that's been a lot of the network for her." Sheila previously completed a substance abuse evaluation which recommended inpatient treatment. Bird stated that Sheila entered a residential treatment center the week before the termination hearing. Early Development Network had not been necessary because Stephanie did not have any significant needs "at this point," and Healthy Families was not utilized during Bird's time on the case because "once you pass [an age] threshold [for the child], you can no longer make referrals." Sheila did not have stable housing and was not employed.

Bird testified regarding the percentage of visits "that at least one parent was present." At least one parent was present for 54 percent of the visits in January 2023 (7 out of 13 visits), 81 percent in February (9 out of 11 visits), 75 percent in March (9 out of 12 visits), 67 percent in April (8 out of 12 visits), and 1 out of 9 visits in May. In February and March, Sheila attended more visits than Cipriano. Bird confirmed that she had reviewed the visitation notes and said, "Sheila does a pretty good job of managing the four children." Sheila has not progressed beyond supervised visits.

Evidence was also presented regarding Sheila's criminal charges that occurred while the juvenile case was ongoing.

Sergeant Andrew Soucie with the Scottsbluff Police Department testified that on July 27, 2022, he responded to a report that several females were shoplifting at a store. When Sergeant Soucie arrived and approached the group of women (including Sheila) in the parking lot, he searched their bags and vehicle and seized "about $240 worth of stolen items." Sergeant Soucie spoke to Sheila who initially denied taking anything, but then admitted to stealing a candy bar and maybe some licorice but nothing else. Sheila was found to have two active warrants for her arrest and was taken into custody. Sergeant Soucie was later informed that during a search of Sheila at

the jail, a blue pill was found on her person. The pill was sent to the state crime lab and the test results confirmed that it was fentanyl, fluorofentanyl, and xylazine; according to Sergeant Soucie, xylazine is used by veterinarians as a noncontrolled anesthesia muscle relaxant, but it is not approved for human consumption. Exhibit 59 is the certified copy of Sheila's criminal case regarding the events of July 27. It reflects that Sheila was charged with "Theft by Shoplifting, Value $500.00 or Less, Third Offense" and "Poss. of Controlled Substance--Fentanyl," both Class IV felonies. She pled no contest to both charges and was subsequently sentenced on March 9, 2023, to concurrent terms of 3 years' probation.

Officer Tyler Webber with the Scottsbluff Police Department testified that on September 22, 2022, he responded to a report of two prior shoplifting incidents at a store; both incidents had occurred earlier that month. One incident occurred on September 17 and involved two individuals who reportedly stole $726 worth of merchandise; Sheila and Cipriano were identified as suspects based on a still image from surveillance footage. The second incident occurred on September 18, was a reported loss of approximately $169 of merchandise, and involved the same suspects according to the store's loss prevention officer. Exhibit 58 is the certified copy of Sheila's criminal case regarding those two incidents. It reflects that Sheila was charged with "Theft by Shoplifting, Value over $500.00 Less than $1500.00" for the September 17 incident, and "Theft by Shoplifting, Value $500.00 or Less, Second Offense" for the September 18 incident; both charged offenses were Class I misdemeanors. She pled no contest to both charges and was sentenced to concurrent terms of 37 days in jail and ordered to pay a total of $800 in fines; she also stipulated to pay restitution of $894.60.

Officer Daniel Harges with the Scottsbluff Police Department testified that on March 6, 2023, he received a report about suspicious activity at a gas station. Officer Harges was "flagged down by an employee who stated that there was a female that she believed was smoking some sort of narcotic in the women's restroom." He followed the employee to the women's restroom, and he detected an odor he recognized to be associated with burned fentanyl. When the woman came out of the restroom, Officer Harges recognized her as Sheila. During a search of Sheila's bag, Officer Harges found a small blue pill, "commonly known . . . to be fentanyl" through other investigations. Sheila was arrested and taken to jail. Sheila was searched at the jail and seven other blue pills were found on her person; again, Officer Harges believed them to be fentanyl. The individual pill was sent in for testing, but the report had not come back yet. Exhibit 60 is a certified copy of a criminal case charging Sheila with possession of a controlled substance (fentanyl), a Class IV felony, for an incident that occurred on March 6; trial was set for the jury term starting July 5.

Adrian Rubottom is a problem-solving court officer for Nebraska Probation which "entails the traditional role of being a probation officer," but also "working with people . . . [in] the problem-solving court program." Rubottom testified that Sheila was placed on probation on March 9, 2023, after being convicted of "[t]heft by unlawful taking, zero to $500, third subsequent charge" and "possession of a controlled substance" (fentanyl). Rubottom stated that Sheila "wasn't great at keeping in contact," but did attend "her orders appointment" on April 11. As part of her probation, Sheila was required to submit to drug and alcohol testing. Her baseline urine test on April 11 was positive for fentanyl, but she had not submitted to drug testing since then. It was Rubottom's understanding that Sheila entered treatment the week prior to the termination hearing.

Clara B. has been the foster mother for Juliana, Noah, and Stephanie since October 6, 2022. (Aaliyah had been placed with several different relatives since removal.) Clara testified that the children used to get excited to go to visits, but now "[t]hey're not as excited as they used to be, but . . . they're still happy to see their family." In the beginning, if the parents were more than 15 minutes late for a visit and the children had to be brought home, they would be "really upset," especially Juliana and Noah. Currently the parents have to call and confirm ahead of time, so if Clara picked the children up after school on a visitation day (instead of a caseworker), the children just ask, "No visit today?" When asked if the children ever speak about Sheila, Clara said, "They do"; "[m]ost of the time it is either, oh, I remember this one time when Mom blah-blah-blah-blah-blah," or "I miss Mom."

Victoria, the children's maternal grandmother, testified that she never saw Sheila use drugs and did not know that she had a drug problem until Sheila told her; "she was a functioning addict, I guess . . . [b]ecause she did -- you know, cleaned house, cooked, did everything that she normally did." Victoria said that Sheila "did fine taking care of her kids" and "has a bond with them."

Sheila testified that she was married to Cipriano but did not know where he was currently. When asked if they were separated, Sheila replied, "I am concentrating on myself. . . . I am not worried about him." Sheila said she was addicted to fentanyl and that methamphetamine is "a secondary drug" for her. She entered an inpatient 30-day "dual diagnostic" treatment program the week before the termination hearing. She was currently on probation, and hoped to do drug court when she gets out of treatment. Sheila said she also had a pending criminal felony case in district court but had not been convicted of anything yet. Sheila knew she had not "done right" by her children, but said she was trying and was in treatment now. She loved her children and wanted them back. On cross-examination, Sheila was asked how long her children should have to wait for her to be in a position to have them back. She replied, "Well, as long as, I guess, it takes for me to get better," but "I want to go to long-term treatment, and I want to take them with me . . . if that's possible."

JUVENILE COURT'S DECISION

In the June 14, 2023, order terminating Sheila's parental rights to Aaliyah, Juliana, Noah, and Stephanie, the juvenile court found that: statutory grounds existed pursuant to § 43-292(2), (4), (6), and (7); Sheila was unfit; and termination of Sheila's parental rights was in the children's best interests.

Sheila appeals.

ASSIGNMENTS OF ERROR

Sheila assigns, restated, that the juvenile court erred in finding that statutory grounds exist to terminate her parental rights under § 43-292(2), (4), and (6), and that termination of her parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate

court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

The State sought to terminate Sheila's parental rights to Aaliyah, Juliana, Noah, and Stephanie under § 43-292(2), (4), (6), and (7). The juvenile court found that all four of those grounds existed by clear and convincing evidence. Although Sheila challenges the court's finding regarding § 43-292(2), (4), and (6), she does not dispute that § 43-292(7) was sufficiently proven.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." The existence of the statutory basis alleged under § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). By the plain and ordinary meaning of the language in § 43-292(7), there are no exceptions to the condition of 15 out of 22 months' out-of-home placement. *In re Interest of Mateo L. et al., supra*. Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al., supra*. In other words, if the 15-out-of-22 months' period is met, § 43-292(7) is met. See *In re Interest of Mateo L. et al., supra*.

The children were removed from parental care in October 2021, and remained in foster care after removal. By the time the motion to terminate parental rights was filed on March 20, 2023, the children had been in out-of-home placements for 17 months, thus the 15-out-of-22 months' period was clearly satisfied.

The State has shown clearly and convincingly that § 43-292(7) exists as a statutory basis for terminating Sheila's parental rights to the children. And since any one of the bases for termination codified in § 43-292 can serve as the basis for termination, we need not consider the sufficiency of the evidence concerning any other statutory basis for termination. *In re Interest of Mateo L. et al., supra*. We next consider whether termination is in the children's best interests.

### BEST INTERESTS AND UNFITNESS

Under § 43-292, in addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). This presumption is overcome only when the State has proved that the parent is unfit. *Id.* Although the term "unfitness" is not expressly stated in § 43-292, the Nebraska Supreme Court has said that it derives from the fault and neglect subsections of that statute and from an assessment of the child's best interests. *In re Interest of Mateo L. et al., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *In re Interest of Leyton C. & Landyn C., supra*. The best interests analysis and the parental fitness analysis are separate inquiries, but each examines essentially the same underlying

facts as the other. *Id.* We have previously set forth the evidence presented at the termination hearing, and we will not recount it again here.

Notably, this is the second juvenile case that Sheila has been involved in; the first case was in 2020 when Stephanie tested positive at birth for methamphetamine and amphetamine. Sheila did not maintain contact with the caseworker in that case and had minimal attendance at visits with her children. That case closed when the children were placed with Cipriano. Five months later, the current case was opened. In the current case, Sheila again failed to maintain contact with her caseworkers and did not regularly attend visits. Additionally, Sheila's drug use continued to be a concern, yet she did not enter treatment until 1 week prior to the termination hearing. While we applaud her for taking that step, it is too little too late for her children.

At the time the termination hearing commenced, the children had been in an out-of-home placement for 19 months. Sheila entered treatment 1 week prior to the termination hearing. Even if she successfully completes treatment, it is unknown when she will be able to reunify with her children given her overall lack of progress and participation in this case. When asked how long her children should have to wait for her to be in a position to have them back, Sheila replied, "Well, as long as, I guess, it takes for me to get better." However, "[c]hildren cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). The children deserve permanency. And when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the children's best interests require termination of parental rights. See *In re Interest of Leyton C. & Landyn C., supra*. The State proved that Sheila was unfit, meaning that she has a personal deficiency or incapacity which has prevented, or will prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to the children's well-being. See *Id.* We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Sheila's parental rights.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Sheila's parental rights to Aaliyah, Juliana, Noah, and Stephanie.

AFFIRMED.